

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00318-CV

IN THE INTEREST OF V.B. AND
T.B., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-103977-16

----------

## MEMORANDUM OPINION[1]

----------

In two issues, Mother appeals the termination of her parental rights to her twin daughters, V.B. and T.B. We affirm.

## Background

Mother's struggle with drug addiction began in 2012 when her grandmother passed away. As she sank further into her addictions to heroin and cocaine, she lost her job and sent her two older sons to live with their father. In 2015, she was convicted of misdemeanor theft and sentenced to 16 days'

---

[1]See Tex. R. App. P. 47.4.

confinement, and she was convicted of the misdemeanor offense of failing to identify herself to an officer and sentenced to another 16 days in jail. Finally, in August 2016, while pregnant with V.B. and T.B., she was convicted of possession of heroin and sentenced to seven months in state jail. About a month later, she gave birth to the twins while incarcerated.

Because Mother had continued to abuse drugs while she was pregnant, the twins tested positive for heroin and cocaine when they were born. And because the twins initially struggled to breathe while eating, they remained in the hospital for about a week after their birth. During that time, the Department of Family and Protective Services (the Department)—which had filed a petition to remove the children and terminate Mother's parental rights—worked with Mother to find a possible placement for the girls while Mother finished serving her sentence. Mother provided the names of three individuals, but none of them proved appropriate to serve as a foster parent. One was a registered sex offender, another had a felony conviction for selling crack cocaine, and a third was financially unable to care for the children.[2] The Department placed the twins

---

[2]The Department located the twins' father shortly after their birth. Although he was a party to this suit and participated in the final trial, he was also a heroin addict and he had a significant criminal history that included arrests for drug offenses, assault, robbery, and criminal mischief. The trial court terminated Father's rights to the children, and Father has not appealed the trial court's decision.

with an unrelated foster family, the Andersons,[3] when they were released from the hospital.

Mother finished serving her sentence and was released in February 2017. Soon after her release, she met with April Vaughan, her Department caseworker, and they developed a service plan that Mother signed and agreed to complete. The service plan required Mother to

- complete a drug assessment and a drug treatment program;

- attend a parenting class;

- attend individual counseling sessions;

- submit to random drug testing;

- refrain from criminal activity, particularly the use of illegal drugs;

- maintain stable housing;

- maintain stable employment;

- attend all scheduled visitation sessions with the children; and

- remain in contact with Vaughan.

To assist her in completing these tasks, the Department provided Mother bus passes, and a Court Appointed Special Advocate volunteer offered to drive her to appointments.

---

[3]To protect the child's identity, we use aliases to refer to the foster family. *See* Tex. R. App. P. 9.8(b)(2); 2nd Tex. App. (Fort Worth) Loc. R. 7; *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

Yet Mother did nothing about her drug-abuse problem after her release from jail. She continued to use drugs—heroin in particular—as recently as two weeks before trial. She failed to complete a drug assessment or participate in a treatment program.[4] And at trial, Mother admitted that she never took the monthly drug tests that were requested by the Department because she knew she would fail them.

Nor did Mother attempt to comply with most of the remaining assigned tasks. Mother never attended a parenting class. Although she scheduled a counseling appointment for two weeks before trial, she did not show up. She obtained a job at a fast-food restaurant, but that was short-lived—she lost the job after about a month. The Department was never able to verify that Mother had secured stable housing, and when Vaughan attempted to visit Mother a week before trial at her last known address, Mother would not let her into the house or identify the man who was living with her. At trial, Mother identified the man with whom she was staying as a friend and testified that she paid about $100 a month in rent using money she received from other friends.

The only portion of the service plan with which Mother attempted to comply was the requirement that she attend supervised visitation with the twins. Mother attended 21 out of 30 scheduled visits and, by all accounts, was very attentive

_____

[4]At trial, Mother testified that she tried to complete the drug assessment but she left the facility after she filled out the paperwork and waited for three hours to be seen. She admitted that she did not try to go back or find another facility to complete the assessment or seek treatment elsewhere.

and loving toward the twins during those visits. Mother played with the girls, fed them, and brought them gifts and clothes. Although she appeared overwhelmed at times when the girls cried, the visits were largely positive.

Approximately a month before trial, Mother suggested another couple, Frank Wells and Dorothy Thomas-Wells, as a placement option. The Department initially approved the couple as a possible placement but withdrew its approval when it discovered that Wells had failed to disclose his substantial criminal history. At trial, Wells admitted that he had been arrested approximately 50 times while living in Colorado, including at least once for assault. Both Wells and his wife testified that they had not tried to hide his criminal past from the Department but claimed that Wells had changed since then.[5]

The case proceeded to trial in late August 2017. The Department presented evidence of Mother's continued use of heroin and her failure to seek treatment for her drug problem and evidence that the twins were thriving in their placement with the Andersons. According to Vaughan, the girls were happy with the Andersons and had bonded with the couple's two older sons. V.B. had received physical therapy to treat hypertonicity, a condition that had affected her ability to learn motor skills like rolling over and crawling. By the time of trial, she had learned how to crawl but was still attending therapy sessions every other

_____

[5]Wells admitted that he violated the law by driving without a license to one visitation session with the twins.

5

week.  The Department felt that the Andersons could meet the twins' emotional, financial, and physical needs in the future.

For her part, Mother attributed her failure to complete the service plan to being overwhelmed—first by her release from jail in February and, later, by her mother's death in June 2017 and her son's hospitalization for complications related to diabetes.  She urged the trial court to give her one more chance—claiming that she had obtained a job providing home healthcare to the elderly beginning the week after trial and that she had signed up to take a parenting class, and promising that she would start a rehabilitation program immediately after trial.  When counsel asked Mother how long it would take her to get herself together, Mother replied, "It's soon enough.  It takes time.  It takes time."

Mother's acquaintances provided their opinions that she was a good mother to her sons and that she just needed some time to get back on her feet, although none of these friends appeared to be aware of the extent of Mother's drug addiction.

The trial court found that Mother had knowingly placed or allowed the children to remain in conditions that endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and failed to comply with the provisions of the service plan.  Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O) (West Supp. 2017).  It further found that

6

termination of Mother's parental rights was in the children's best interest. *Id.* § 161.001(b)(2). This appeal followed.

## Discussion

### I. Mother's request for a continuance

Mother argues in her first issue that the trial court erred by denying her request for a continuance of the final trial. Her argument is two-fold: first, Mother argues that the trial court was required to grant the continuance because the Anderson's petition to intervene was filed less than 45 days before the trial. Second, Mother argues that the trial court abused its discretion because she was only allowed, in her estimation, six months to complete the service plan.

#### A. The intervention and rule 245

The Andersons filed a petition to intervene twenty-five days before the August 29 trial setting. In the petition, the Andersons declared their desire to adopt the twins and requested that the trial court terminate Mother's parental rights.

On appeal, Mother argues that because the Andersons filed their petition less than 45 days before trial, Mother was not given the 45 days' notice of trial required by rule 245. *See* Tex. R. Civ. P. 245 (requiring the trial court to provide no less than 45 days' notice to the parties of a first trial setting). This argument fails because Mother did not preserve error on this issue. *See* Tex. R. App. P. 33.1(a) (providing that a party must present a timely request, objection, or motion

7

that states the specific grounds for the desired ruling in order to preserve a complaint for appellate review).

Four days before the trial setting, Mother filed her motion for a continuance and argued that the trial should be continued because (1) the intervention "raised new issues" related to the Wellses as a possible placement option and Mother needed "adequate time" to disprove the allegations of Wells's past legal troubles[6] and (2) Mother needed more time to complete her service plan because her incarceration, her mother's death, and her son's hospitalization had encumbered her ability to do so. While Mother argued "surprise" by the issues raised in the new pleadings, she did not argue in her motion—or at the hearing on the motion—that she was entitled to a continuance because the Andersons' petition was filed less than 45 days before the final trial. *See also* Tex. R. Civ. P. 63 (allowing parties to amend their pleadings up to seven days before trial so long as amendment does not operate as a surprise to the opposite party).

Specifically, with regard to rule 245, a party must timely and specifically object to insufficiency of notice of the trial setting to preserve that complaint for

---

[6]The motion stated,

An Intervention Action was filed earlier this month which has raised new issues that cannot be resolved or fully investigated in time for the currently scheduled hearing dates. Specifically, Intervenors have alleged possible legal issues regarding the past of Frank Wells, who has been under consideration as a fictive kin placement for the children. The fictive kin placement is the option most likely to result in eventual family reunification and should not be set aside based on allegations that might be disproved if granted adequate time to do so.

8

review.  *Padilla v. Comm'n for Lawyer Discipline*, 87 S.W.3d 624, 626 (Tex. App.—San Antonio 2002, pet. denied); *State Farm Fire & Cas. Co. v. Price*, 845 S.W.2d 427, 432 (Tex. App.—Amarillo 1992, writ dism'd by agr.); *see also In re A.H.*, No. 02-06-00211-CV, 2006 WL 3438179, at *1 (Tex. App.—Fort Worth Nov. 30, 2006, no pet.) (mem. op.) (holding objection to untimely notice of trial setting did not preserve anything for review when it was not made until motion for new trial was filed).  Because Mother's motion and argument did not raise lack of timely notice under rule 245, she did not preserve this portion of her first issue.  *See Stallworth v. Stallworth*, 201 S.W.3d 338, 346–47 (Tex. App.—Dallas 2006, no pet.) (holding any error was waived when wife's motion cited several reasons for a continuance but none objected to lack of proper notice under rule 245).  We therefore overrule this portion of her first issue.

### B.  Mother's request for more time

As to Mother's complaint that she should have received more time to complete her service plan, we will not disturb the trial court's ruling unless it committed a clear abuse of discretion.  *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002).  A trial court abuses its discretion if it reaches a decision "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law."  *Id.* (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985) (orig. proceeding)).

Mother argued to the trial court that she was not given enough time to complete the service plan.  First, Mother argued that she was entitled to a year's

9

time to complete the service plan because, in a termination suit filed by the Department, the trial court must commence a trial on the merits within one year of the date on which the Department is appointed as a temporary managing conservator. *See* Tex. Fam. Code Ann. § 263.401(a) (West Supp. 2017). Mother cites no authority in support of this argument, and we have not found any. Section 263.401(a) does not address service plans or otherwise connect them to the trial court's duty to dismiss the suit a year after rendering a temporary order if it has not commenced a trial or granted one of the limited extensions allowed by the statute. *Id.* We decline to impose a requirement that exceeds those imposed by statute.

Furthermore, during the six-month period Mother had to complete her service plan, she did nothing to address the Department's main concern—her continued abuse of drugs. And while we acknowledge that during this time Mother experienced the death of her mother and her son's hospitalization, even prior to these unfortunate events, she had done nothing about her drug problem. Mother's assertion that she was at a disadvantage due to her incarceration during part of that time is of no avail, either, as it also does not explain her failure to act upon release. From our review of the record, the trial court had no evidence before it—other than Mother's bare assurances—that Mother intended to complete these requirements of her service plan. Thus we cannot hold that the trial court abused its discretion in denying Mother's motion for continuance. We therefore overrule the remainder of her first issue.

## II. Sufficiency of the evidence

In her second issue, Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination was in the best interest of the children.

### A. Standard of review and applicable law

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. *Id.* § 161.206(b) (West Supp. 2017); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We therefore strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence[7] that the parent's actions satisfy

---

[7]Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be

11

one ground listed in family code section 161.001(b)(1) and that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.— Fort Worth 2012, no pet.). Here, however, Mother challenges only the best interest determination.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not

established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

12

reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

The same evidence may be probative of both the subsection (1) grounds and the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the child's best interest include

(A)    the child's desires;

(B)    the child's emotional and physical needs now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the child's best interest;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the parent's acts or omissions which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may

13

be sufficient in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Application

In her brief, Mother relies primarily on her attendance of supervised visitation sessions with the twins as well as testimony that she was a good mother to her two older sons.

The evidence did establish that Mother attended most visitations and that such visits were constructive, and some evidence did support her contention that she was a good mother to her two older sons. But that evidence alone is not dispositive. We must view all of the evidence in context, and we cannot ignore Mother's continuing battle with drug abuse. Mother's drug problem was the reason her sons did not live with her, and it had placed the twins at serious risk even before they were born. Yet knowing that her drug use was harmful to herself and the twins, Mother used drugs while pregnant and continued to use drugs once she was released from jail. *See In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." (quoting *In re J.A.G.*, No. 02-10-00002-CV, 2010 WL 4539442, at *1 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.)). And even though her supervised visitations were, by

14

all accounts, positive, Mother did nothing about her drug problem even though she knew that obtaining custody of her children hinged on addressing the problem and despite the Department's offers of assistance to obtain treatment. Her failure to obtain treatment or counseling and to successfully complete drug tests weighs in favor of termination. *See In re A.B.*, 269 S.W.3d 120, 129 (Tex. App.—El Paso 2008, no pet.) (weighing mother's refusal to comply with a family service plan in affirming termination of her parental rights); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) (noting that evidence of illegal drug use is relevant in determining whether a parent poses a present or future risk of physical or emotional danger to a child).

Mother presented no solid plans for the children if she were to regain custody. When asked, she simply testified that she "want[ed] her kids back with [her]" and she wanted them to be raised with her sons. She did not provide any insight to where the children would live or how she would provide for them. *See In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs."). Although she testified she planned to start work as a home healthcare provider a week after trial, she provided no information as to whether that job could provide the means to support herself and the twins. And her history of employment provided no assurance of stability. She had lost her previous job after only one month. *See S.N.*, 272 S.W.3d at 52 (considering mother's failure to maintain employment and evidence that she was

fired from two jobs during CPS investigation). This evidence weighs in favor of termination.

Furthermore, V.B. had already required medical attention and physical therapy early in life to treat the hypertonicity that risked delaying her development. The physical therapy was a continuing need at the time of trial, and there was little evidence presented to assure the court that Mother could meet that need. The evidence related to the physical needs of the children also weighs in favor of termination.

Finally, although the twins were only ten months old at the time of trial and were therefore unable to express their desires, all evidence indicated that they were thriving in their placement with the Andersons. *See In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent."); *In re J.N.H.*, No. 02-11-00075-CV, 2011 WL 5607614, at *7 (Tex. App.—Fort Worth Nov. 17, 2011, no pet.) (mem. op.) (considering two-and-a-half-year-old child's happy demeanor around intended placement family and fear of strangers where she had never met appellant father). The Andersons obtained appropriate care for V.B.'s hypertonicity and continued to facilitate her physical therapy sessions. The twins had happily bonded with the Andersons' sons, and the Andersons' home was stable and appropriate for the twins. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—

16

Houston [14th Dist.] 2014, no pet.) (noting that, when children are too young to express their desires, the factfinder may consider evidence that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent). This, too, weighs in favor of termination.

Based on our review of the entire record, the evidence was factually sufficient to support the trial court's finding that it was in the children's best interest. We therefore overrule Mother's second issue.

## Conclusion

Having overruled each of Mother's two issues on appeal, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL: SUDDERTH, C.J.; WALKER and PITTMAN, JJ.

DELIVERED: February 8, 2018